

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-4-2006

# Delaware Nation v. Comm of PA

Precedential or Non-Precedential: Precedential

Docket No. 04-4593

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Delaware Nation v. Comm of PA" (2006). *2006 Decisions.* Paper 1010.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1010

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 04-4593

———————

THE DELAWARE NATION, A FEDERALLY
RECOGNIZED INDIAN TRIBE,
IN ITS OWN NAME AND AS THE SUCCESSOR IN INTEREST
TO "MOSES" TUNDY TETAMY, A FORMER CHIEF OF
THE DELAWARE NATION, AND OF HIS DESCENDANTS

v.

COMMONWEALTH OF PENNSYLVANIA; EDWARD G.
RENDELL; COUNTY OF NORTHAMPTON,
PENNSYLVANIA; J. MICHAEL DOWD; RON ANGLE;
MICHAEL F. CORRIERE; MARY ENSSLIN; MARGARET
FERRARO; WAYNE A. GRUBE; ANN MCHALE;
TIMOTHY B. MERWARTH; NICK R. SABATINE;
COUNTY OF BUCKS, PENNSYLVANIA; MICHAEL G.
FITZPATRICK; CHARLES H. MARTIN; SANDRA A. MILLER;
TOWNSHIP OF FORKS, PENNSYLVANIA;
JOHN ACKERMAN; DAVID KOLB;
DONALD H. MILLER; DAVID W. HOFF;
HENNING HOLMGAARD; BINNEY & SMITH, INC.;
FOLLETT CORPORATION; ROBERT AERNI;
MARY ANN AERNI; AUDREY BAUMAN;
DANIEL O. LICHTENWALNER;
JOAN B. LICHTENWALNER; CAROL A. MIGLIACCIO;
JOSEPH M. PADULA; MARY L. PADULA; JACK REESE;
JEAN REESE; ELMORE H. REISS;
DOROTHY H. REISS; GAIL N. ROBERTS;
CARL W. ROBERTS; WARREN F. WERKHEISER;
ADA A. WERKHEISER; WARREN NEILL WERKHEISER;
NICK ZAWARSKI AND SONS DEVELOPERS INC.; JOHN
DOES 1-250; JOHN DOE COMPANY; MARK SAMPSON;
CATHY SAMPSON

The Delaware Nation,

Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 04-cv-00166)
District Judge: Honorable James McGirr Kelly

Argued November 8, 2005

Before: ROTH, FUENTES, and GARTH, <u>Circuit Judges</u>.

(Opinion Filed May 4, 2006)

Stephen A. Cozen (**Argued**)
Thomas B. Fiddler, Esquire
Thomas G. Wilkinson, Jr., Esquire
Cozen & O'Connor
1900 Market Street, 4ᵗʰ Floor
Philadelphia, PA 19103

Counsel for Appellant


Benjamin S. Sharp, Esquire (**Argued**)
Donald C. Baur, Esquire
Perkins Coie
607 14ᵗʰ Street, N.W.., Suite 800
Washington, DC 20005

David F. B. Smith, Esquire (**Argued)**
Ryberg & Smith
1054 31ˢᵗ Street, N.W.
Washington, D.C. 20007

Mark A. Kearney, Esquire (**Argued)**
Elliott, Reihner & Siedzikowski
925 Harvest Drive, Suite 300
P.O. Box 3010
Blue Bell, PA 19422

Andrew J. Bellwoar, Esquire (**Argued**)
Siana, Bellwoar & McAndrew
941 Pottstown Pike, Suite 200
Chester Springs, PA 19425

Raymond J. DeRaymond, Esquire
DeRaymond & Smith
717 Washington Street
Easton, PA 18042

Darryl J. May, Esquire
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street, 51st Floor
Philadelphia, PA 19103

William P. Leeson, Esquire
Leeson, Leeson & Leeson
70 East Broad Street
P.O. Box 1426
Bethlehem, PA 18016

Blair H. Granger, Esquire
Blair H. Granger & Associates
1800 East Lancaster Avenue
Paoli, PA 19301

Thomas L. Walters, Esquire
Lewis and Walters
46 South Fourth Street
Easton, PA 18042

Counsel for Appellees

OPINION OF THE COURT

**ROTH**, <u>Circuit Judge</u>:

This case arises from the claim of an American Indian nation to a portion of its aboriginal land. For the reasons that follow, we find that any aboriginal rights held by the Delaware Nation to the land known as "Tatamy's Place" were extinguished by Thomas Penn via the Walking Purchase of 1737. We also find that the tribe does not hold fee title to Tatamy's Place. Thus, the District Court properly dismissed the Delaware Nation's claim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action. *The Delaware Nation v. Commonwealth of Pa., et al.*, 2004 U.S. Dist. Lexis 24178 (E.D. Pa. 2004). Accordingly, we will affirm the dismissal order of the District Court although we do not base our conclusion on the same reasoning.

## I.    Background

In January 2004, the Delaware Nation filed this lawsuit, as the successor in interest and political continuation of the Lenni Lenape and of Lenni Lenape Chief "Moses" Tundy Tatamy, claiming aboriginal and fee title to 315 acres of land located in Northampton County, Pennsylvania, known as "Tatamy's Place."[1] The defendants in this case are residents or businesses, currently occupying the land, or government entities sanctioning the tenants' possession. The Delaware Nation seeks to enforce its rights to Tatamy's Place pursuant to the Trade and Intercourse Act, also known as the Indian Nonintercourse Act, 25 U.S.C. § 177 (1799), and federal common law. The Delaware Nation is seeking both equitable relief and monetary damages.

The history of Tatamy's Place is yet another sad example of our forefathers' interactions with the Indian nations. The following historical allegations are taken from the Complaint

---

[1]For purposes of this appeal, the Lenni Lenape and the Delaware Nation are synonymous.

and the public record.[2]  In 1681, William Penn secured a Charter from King Charles II for what is now Pennsylvania.  Through the Charter, William Penn and his heirs were vested with control of Pennsylvania's land as its Proprietor.[3]  William Penn formed a government consisting of three branches:  (1) a governor with limited powers, (2) a legislative Council empowered to propose legislation, and (3) a General Assembly empowered to approve or reject the legislative initiatives proposed by the Council.  Sections XVII through XIX of the Charter established a proprietary government that "gave Penn broad powers in selling or renting his lands.  Those purchasing land from him must have his approval of any method they themselves might use to sell the land to others."  Penn's government provided for "secure private property."

In contrast to governors of other colonies, William Penn achieved peaceful relations with the Indians, including the Lenni Lenape, by acquiring land through purchase rather than conquest.  William Penn's son, Thomas, was one of the eventual successors to his father's interests in Pennsylvania.[4]  In 1737, Thomas Penn executed the now-infamous "Walking Purchase" with the Delaware Nation.  This purchase included Tatamy's Place.  To make a tragic story short, the Walking Purchase was the result of a massive fraud perpetuated by Thomas Penn on the

---

[2] Courts may consider matters of public record, exhibits attached to the complaint, and undisputedly authentic documents attached to a motion to dismiss.  *See Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

[3] A proprietor is "[o]ne who has the legal right or exclusive title to property, business, etc."  BLACK'S LAW DICTIONARY 1220 (6th ed. 1990).

[4] Following a stroke in 1712, William Penn's second wife became the Proprietor of the province until her death in 1727.  Penn's sons and grandsons then became the Proprietors of the territory.

Delaware Nation.[5]

Although most members of the Delaware Nation left the area following the Walking Purchase, a leader of the group, Chief Tatamy, continued to occupy Tatamy's Place with the approval of the Penns. In consideration for Chief Tatamy's friendship towards the white settlers, he was issued two land patents for Tatamy's Place – both of which postdate the Walking Purchase. The first patent was dated April 28, 1738, and the second was dated January 22, 1741.

The 1741 Patent provided:

at the Instance and request of the said Tundy Tatamy in consideration of his Surrendering and delivering up to be Cancelled the said former patent of the said Premises & of the Sum of Forty Eight Pounds Sixteen shillings and five Pence lawful Money of Pennsylvania to our use paid by the said Tundy Tatamy . . . We have given granted released & confirmed and by these presents for us our Heirs and Successors do grant release and confirm unto said Tundy Tatamy and his Heirs the said Three hundred and fifteen Acres of Land as the same now set forth . . .

Also, Chief Tatamy had to seek special permission from the Provincial Council of Pennsylvania to remain in Tatamy's Place following the Walking Purchase. The Minutes of the Provincial Council meeting of November 20, 1742, indicate that the Governor granted permission to Chief Tatamy to remain on

---

[5]Thomas Penn falsely represented to the Lenni Lenape that some fifty years earlier the Lenni Lenape Chiefs had signed a document providing that land, which could be covered in a walk of one-and-one-half days, was to be deeded to the Penns. Unbeknowst to the Lenni Lenape, who had envisioned a leisurely walk through the tangled Pennsylvania forests, Thomas Penn had cleared a path and hired three of the fastest runners in the territory to navigate a pre-determined path. The Lenni Lenape ended up ceding 1,200 square miles of land. The document later proved to be a forgery.

his land on the express condition that "the other Petitioners were by no means to be included in this Permission, nor any other of the Delaware Indians, whom they call their Cousins, nor any besides themselves and their proper families dwelling in the same Houses with them."[6]  IV MINUTES OF THE PROVINCIAL COUNCIL at 625.

After Chief Tatamy, the history of the title to the land is not clear.  The next record concerning Tatamy's Place is a deed recorded on March 12, 1803, in which Edward Shipper, as the Executor of the Estate of William Allen, conveys the land to the Strecher family.  The deed recites a purported agreement between the Strechers and Allen forty years prior to Allen's death.  Nonetheless, the history fails to explain how title passed from Chief Tatamy to William Allen or his predecessors.

The Delaware Nation's Complaint alleges two general theories as to why the group is entitled to recovery.  First, the Delaware Nation contends that, because Tatamy's Place was taken by deception via the Walking Purchase, the tribe's aboriginal rights were never validly extinguished.  As such, the Delaware Nation has a right of continued occupancy and use consistent with the doctrine of discovery.  Second, the Delaware Nation, as the successor in interest to Chief Tatamy, claims fee title to Tatamy's Place based on the land grants from the Proprietors.  The Delaware Nation further asserts that the subsequent alienation of fee title from Chief Tatamy violated the

---

[6]The Minutes of the Provincial Council were compiled and printed pursuant to Pennsylvania law as a public record.  Act of April 14, 1838, Act No. 68, P.L. 395, § 7 ("That the Secretary of the Commonwealth be, and he is hereby authorized and required to continue the printing of the Minutes of the Council of the Proprietary Government, down to the period of the Revolution . . . and to include *other public records* and documents therein mentioned . . .") (emphasis added).  Therefore, the Minutes may be considered by the Court on a motion to dismiss.  *See Pension Benefit Guar. Corp.*, 998 F.2d at 1196.

7

Trade and Intercourse Act of 1799.  1 Stat. 743, 746 (1799).[7]

On November 30, 2004, the District Court dismissed the Complaint in its entirety for failure to state a cause of action. *The Delaware Nation*, 2004 U.S. Dist. Lexis 24178;  FED. R. CIV. PROC. 12(b)(6).  The District Court, having found that the Delaware Nation admitted that Thomas Penn had the sovereign authority to take Tatamy's Place, ruled that Thomas Penn's method of acquisition, *i.e.* fraud, was legally irrelevant. Moreover, the District Court found that the Nonintercourse Act was inapplicable in this case because Tatamy's Place did not represent "tribal land."  The Delaware Nation appealed.

## II.    Jurisdiction and Standard of Review

Our review of the grant of a motion to dismiss is plenary. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250 (3d Cir. 1994).  When considering an appeal from a dismissal of a complaint pursuant to Rule 12(b)(6), we accept as true all well-pled factual allegations.  *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir. 1997).  We examine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.  *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002).

The District Court exercised jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362 ("The district courts shall have original jurisdiction of all civil actions, brought by any Indian

_____

[7]The Trade and Intercourse Act of 1799 provides in part:

> No purchase, grant, lease or other conveyance of lands, or of any title or claim thereto, from any Indian, or nation or tribe of Indians, within the bounds of the United States, shall be of any validity, in law or equity, unless the same by made by treaty or convention, entered into, pursuant to the constitution

8

tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."). The Delaware Nation is recognized by the Secretary of the Interior. See 67 FED. REG. 46328 (2002). We have jurisdiction under 28 U.S.C. § 1291.

## III. Discussion

### A. Thomas Penn's Extinguishment of Aboriginal Rights[8]

The doctrine of discovery, which governs the relationship between the European colonial powers and the Indians, holds that the discovering nation takes fee title to the land, subject to the aboriginals' right of occupancy and use. *County of Oneida v. Oneida Indian Nation of New York State*, 470 U.S. 226, 234 (1985); *Johnson v. M'Intosh*, 21 U.S. 543, 588 (1823) ("All our institutions recognise the absolute title of the crown, subject only to the Indian right of occupancy, and recognise the absolute title of the crown to extinguish that right."). The Indians' right of occupancy and use (aboriginal title) could only be extinguished with the consent of the sovereign. *County of Oneida*, 470 U.S. at 234. The Delaware Nation claims in its

---

[8]Some of the defendants urge us to dismiss the complaint because this action is barred by the equitable doctrines of laches, acquiescence and impossibility. These defendants cite *City of Sherrill v. Oneida Nation of New York*, 544 U.S. 197 (2005), and claim that the same considerations that led the *Sherrill* court to rule against the Oneida Indian Nation are relevant here. We need not address this argument because we find that the Delaware Nation's claims fail on the merits.

Some of the defendants also argue that the Delaware Nation's aboriginal title was extinguished when the tribe signed the Treaty of Greeneville of 1795. We need not address this argument either – or explain the treaty's provisions – because we find that the Walking Purchase of 1737 extinguished the tribe's aboriginal title.

appeal that the King of England – not Thomas Penn – was the sovereign over the territory that included Tatamy's Place. Therefore, Thomas Penn could not extinguish aboriginal title via the Walking Purchase and, consequently, the Delaware Nation maintains a right of occupancy and use.

The Delaware Nation's argument fails because the issue of Thomas Penn's lack of sovereign authority was not raised before the District Court. *The Delaware Nation*, 2004 U.S. Dist. Lexis 24178, * 26 ("Plaintiff does not contest that Thomas Penn and the other Proprietors of the time maintained sovereign authority to extinguish this aboriginal title."). The closest the Delaware Nation comes to raising the issue is ¶ 31 of its Complaint, in which it notes that the Penns were "accountable directly to the King of England." However, this paragraph fails to put the District Court or the defendants on notice of the Delaware Nation's purported argument on appeal – that Thomas Penn lacked the sovereign authority or consent from the King of England to extinguish aboriginal title in Pennsylvania.[9]

Absent exceptional circumstances, this Court will not consider issues raised for the first time on appeal. *Harris v. City of Philadelphia*, 35 F.3d 840, 845 (3d Cir. 1994). Although the Delaware Nation now contends that it did not *concede* the argument that Thomas Penn had the sovereign authority to extinguish aboriginal title, it does not, and cannot, argue that it

[9]The Delaware Nation seemed to claim at oral argument that such sovereign authority could not be delegated by the King. This argument, also, was not raised before the District Court. Only in exceptional circumstances, where under the circumstances it would be just to do so, will we consider issues that were not raised in the district court. *Wagner v. Pennwest Farm Credit*, 109 F.3d 909, 911 (3d Cir. 1997). Although the exceptional circumstances exception has been read to apply to situations where there has been an intervening change in law or the lack of representation by an attorney, a general public interest exception does exist. *In Re: Gen. Datacomm Indus. Inc.*, 407 F.3d 616, 634 n.13 (3d Cir. 2005). The Delaware Nation fails, however, to articulate an exceptional circumstance.

*raised* the issue before the District Court. *See Houghton v. American Guaranty Life Ins. Co.*, 692 F.2d 289, 294-5 (3d Cir. 1982) (noting that the issue must be brought to the attention of the district court to be heard on appeal). Therefore, the issue is waived.

The Delaware Nation next argues that, even if Thomas Penn was sovereign and had the power to extinguish its aboriginal title with the Walking Purchase, he did not do so because the circumstances surrounding the Walking Purchase were fraudulent, and "fraud is not a valid means to extinguish aboriginal title." However, the manner, method, and time of the sovereign's extinguishment of aboriginal title raise political, not justiciable, issues. *United States v. Santa Fe Pac. R.R. Co.*, 314 U.S. 339, 347 (1941). "[W]hether (extinguishment) be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, *or otherwise*, its justness is not open to inquiry in the courts." *Id*. (emphasis added); *United States v. Alcea Band of Tillamooks*, 329 U.S. 40, 46 (1946) (noting that the sovereign "possessed exclusive power to extinguish the right of occupancy at will."). Accordingly, the District Court correctly held that "[p]roof of fraud is not a material fact that would nullify Proprietory Thomas Penn's extinguishing act." *The Delaware Nation*, 2004 U.S. Dist. Lexis 24178, * 28.[10]

For extinguishment to occur, the sovereign must intend to revoke the Indians' occupancy rights. *United States v. Gemmill*, 535 F.2d 1145, 1148 (9th Cir. 1976). The intent to

---

[10]Against the aforementioned Supreme Court precedent, the Delaware Nation offers a Western District of New York case for the proposition that aboriginal title can only be extinguished by (1) war or physical dispossession or (2) contract or treaty. *Seneca Nation of Indians v. New York*, 206 F. Supp.2d. 448, 504 (W.D.N.Y. 2002). *Seneca Nation* is in no way controlling precedent. Nor, indeed, does it help the Delaware Nation because it does not challenge the nonjusticiable nature of the manner in which the sovereign executes a purchase or a treaty with an Indian entity.

11

extinguish aboriginal title must be "plain and unambiguous" based on either the face of the instrument or surrounding circumstances. *Seneca Nation of Indians v. New York*, 382 F.3d 245, 260 (2d Cir. 2004). Extinguishment cannot be lightly implied. *Santa Fe Pac. R.R. Co.*, 314 U.S. at 354.

The District Court held that the Delaware Nation's Complaint made it clear that Thomas Penn executed the Walking Purchase intending to take from the Delaware Nation its claim to land in Pennsylvania, including Tatamy's Place. *The Delaware Nation*, 2004 U.S. Dist. Lexis 24178, * 28-9. The Complaint notes that Thomas Penn, in order to pay creditors, needed to sell tribal land. To acquire such land, in the first place Thomas Penn executed the Walking Purchase. Complaint at ¶ 38. To now argue that Thomas Penn did not intend to extinguish aboriginal title to Tatamy's Place, which is indisputably land covered by the Walking Purchase, contradicts the very allegations of the Complaint. Put another way, there are no facts or allegations in the public record or in the Complaint which could be used to question Thomas Penn's intention to extinguish aboriginal rights in Tatamy's Place. Moreover, if the Delaware Nation still retained aboriginal title to Tatamy's Place, there would have been no need to grant Tatamy the 1741 patent in fee.

### B. Chief Tatamy's Land Patents

The Delaware Nation argues that, even if Thomas Penn did extinguish its aboriginal title to Tatamy's Place, it may nonetheless pursue its claim under the Nonintercourse Act because it holds fee title to Tatamy's Place. It acquired this fee title, the tribe explains, when the Proprietors granted Tatamy's Place to Chief Tatamy because the Chief accepted the title not in his individual capacity, but as a representative of the tribe.[11]

_____

[11]The District Court thought the Delaware Nation had argued that the 1738 and 1741 patents "revived" the tribe's aboriginal title. It rejected that argument, holding that aboriginal title, "once having been extinguished, could not be revived, even if title was thereafter acquired by those who originally possessed

12

Even assuming that the Nonintercourse Act applies to land reacquired by an Indian tribe in fee after the sovereign extinguished its aboriginal rights to the land – an issue which appears to be unsettled,[12] but which is not necessary for us to decide here – the Delaware Nation's claim must fail because it is clear that the Proprietors granted Tatamy's Place to Chief Tatamy in his individual capacity, and not as an agent of the tribe.

As noted earlier, the Nonintercourse Act provides, in pertinent part:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. §177.

To establish a *prima facie* case for violation of the Act, the Delaware Nation is required to allege that (1) it is an Indian tribe, (2) the land in question is tribal land, (3) the sovereign has never consented to or approved the alienation of this tribal land, and (4) the trust relationship between the United States and the

---

that" title. District Court Opinion at 28 (citing *Tuscarora Nation of Indians v. Power Authority of the State of New York*, 164 F. Supp. 107 (W.D.N.Y. 1958)). The Delaware Nation clarifies in its brief that it "never asserted that . . . its rights were . . . revived by way of the patent grants to Chief Tatamy," but rather that the tribe has "two parallel interests" in Tatamy's Place: aboriginal title and fee title. Brief at 37.

[12]*See, e.g., Cass County, Minnesota v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 115 n.5 (1998) ("This Court has never determined whether the Indian Nonintercourse Act . . . applies to land that has been rendered alienable by Congress," *i.e.*, land the aboriginal title to which the sovereign has extinguished, "and later reacquired by an Indian tribe.").

tribe has not been terminated or abandoned. *Seneca Nation*, 382 F.3d at 258; *Golden Hill Paugusett Tribe of Indians v. Weicker*, 39 F.3d 51, 56 (2d Cir. 1994); *Epps v. Andrus*, 611 F.2d 915, 917 (1st Cir. 1979) (overruled on other grounds).

The Delaware Nation claims that the land in question – Tatamy's Place – is "tribal land" (element 2) because it holds fee title to the land as a tribe. The language of the 1741 land patent suggests otherwise.

In interpreting grants of land by the government, intent of the government is a prominent consideration, and the language of the grants is to be strictly construed. 3 Norman J. Singer, Sutherland Statutory Construction §64:7 (6th ed. 2000). The language of the 1741 patent, quoted earlier, unambiguously conveyed land to an individual – Chief Tatamy and his heirs. It did not convey to the tribe. It is not necessary to look beyond the four corners of the patent, but we nonetheless note that the minutes of the Provincial Council, also quoted above, explicitly confirm that the Proprietors intended the land to go to Chief Tatamy alone, and not "any other of the Delaware Indians."

The Delaware Nation presses the argument that, even if the Proprietors did not intend in 1741 to grant the land to the tribe as a collective, this is how the tribe received the grant because "the Lenni Lenape did not recognize the concept of individual ownership of land."[13] This argument is unpersuasive.

---

[13]To demonstrate that conveyances to Indian tribes as collectives were common, the tribe cites *Mashpee Tribe v. Watt*, 542 F. Supp. 797, 805 (D. Ma. 1982). That case, however, notes that the practice of a tribe's chief or head man granting land to a non-Indian as a representative of his tribe was common. The tribe points to no case in which land was granted to an individual Indian in fee simple with the unexpressed intention that that Indian's entire tribe receive the conveyance. Moreover, there are many treaties from a later period in which the United States, intending to grant land in fee simple to an Indian tribe, did so by designating the tribe explicitly as the grantee, which the Proprietors did not do here. See *Cohen's Handbook of*

The subjective state of mind of the grantee is not a consideration in interpreting public land grants. Moreover, and quite notably, the Complaint nowhere clearly alleges that Chief Tatamy intended to receive the 1741 land patent in his capacity as representative of the tribe.[14]

None of the canons of construction that the parties urge the court to apply (e.g., construing agreements with Indians "in the sense in which they would naturally be understood by the Indians," resolving ambiguities in public land grants in favor of the government, etc.) are applicable because the terms of the land patent are completely unambiguous. The Delaware Nation fails to state a claim under the Nonintercourse Act because the land in question is not "tribal" in any sense of that word.[15] **IV. Conclusion**

For the foregoing reasons, we find that the Delaware Nation's aboriginal rights to Tatamy's Place were extinguished in 1737 and that, later, fee title to the land was granted to Chief

---

*Federal Indian Law* §9.4, footnotes 22-26 and accompanying text (quoting treaties that grant land in fee simple to, for example, "the Wyandotts, and to their heirs forever" and "to the Creek nation of Indians . . . and the right thus guaranteed by the United States shall be continued to said tribe of Indians, so long as they shall exist as a nation").

[14]Paragraph 10 of the Complaint refers generally to communal ownership of land by the Delaware Nation, but the allegations of succeeding paragraphs – particularly paragraphs 42, 43, 44 and 45 – all speak in terms of an individual grantee. For example, 45 states that "Chief Tatamy's fee simple ownership of Tatamy's Place is documented and indisputable. Neither he nor his heirs ever divested their interest in Tatamy's Place."

[15]In addition, Judge Roth would hold that the Nonintercourse Act claim would fail even had the land in question been tribal because the Delaware Nation failed to identify a specific land conveyance that violated the Act or to allege that the gap in the chain of title post-dates the Nonintercourse Act's enactment.

Tatamy – not to the tribe as a collectivity. We will thus affirm the District Court's dismissal of the Delaware Nation's Complaint.