**Brenda L. ERDMAN, Appellant,**

v.

**NATIONWIDE INSURANCE COMPANY, Appellee.**

No. 07–3796.

United States Court of Appeals, Third Circuit.

Argued Nov. 17, 2008.

Filed: Sept. 23, 2009.

Patricia C. Zucker, [Argued], Daley Zucker Meilton Miner & Gingrich, Wormleysburg, PA, Attorneys for Appellant.

Donald R. Keller, [Argued], Vladimir P. Belo, Bricker & Eckler, Columbus, OH, Attorneys for Appellee.

Before: SCIRICA, Chief Judge, FUENTES and HARDIMAN, Circuit Judges.

## OPINION OF THE COURT

HARDIMAN, Circuit Judge.

Brenda Erdman challenges the District Court's summary judgment in favor of her former employer, Nationwide Insurance Company. The principal issue on appeal—whether Erdman accumulated sufficient hours to qualify for leave under the Family and Medical Leave Act (FMLA)—raises questions of first impression in this Court.

## I.

Our review of the District Court's grant of summary judgment is plenary, viewing the facts in the light most favorable to the nonmoving party. Summary judgment is appropriate only if there are no genuine issues of material fact such that the movant is entitled to judgment as a matter of law. *See McTernan v. City of York*, 564 F.3d 636, 646 (3d Cir.2009).

## A.

Nationwide hired Erdman in 1980 and she held various full-time positions until 1998, when she asked to work part-time so she could care for her daughter Amber, who was born with Down Syndrome. Nationwide granted this request, as well as Erdman's request four years later to switch to a four-day work week, which rendered Erdman a non-exempt employee under federal law. According to Patty Sarno, Erdman's supervisor at the time, Erdman was a reliable employee who regularly worked extra hours outside the office. Indeed, Sarno consistently authorized payment for these hours or allowed Erdman to use them as "comp" time.

In early 2002, soon after Erdman switched to a four-day work week, Sarno informed her that she should "put in the hours that ... you're supposed to put in and nothing more than that." In September 2002, Erdman e-mailed Stella Getgen, who had replaced Sarno as Erdman's supervisor some five months earlier, to request clarification whether she was still allowed to work extra hours for use as "comp" time. There is no record of any response by Getgen, who, despite this e-mail, claims that she first heard the phrase "comp" time in a January 2003 meeting with Erdman regarding a discrepancy in Erdman's accrued vacation time. After Erdman explained that she had used "comp" time, Getgen conceded that Erdman's vacation time calculation was correct, and made no objection to her use of "comp" time.

A week later, on January 28, 2003, Getgen e-mailed Erdman to admonish her for

three reasons: (1) Erdman's overtime was unapproved; (2) Erdman failed to consult Getgen before visiting a policyholder's residence; and (3) employees in Erdman's position were not authorized to conduct fieldwork. Getgen concluded: "As much as we are tempted to do a 'simple' field investigation, there are legal and logistical reasons that prohibit us from doing so." Two weeks later, on February 10, 2003, Getgen for the first time advised Erdman that she could no longer use extra hours for "comp" time.

Soon after Getgen admonished her, Nationwide informed Erdman that her part-time position would be eliminated, but she could work full-time instead. Erdman accepted the full-time position, but Nationwide claims that Erdman became angry and erratic because she was unhappy with her return to full-time status. Over the next several weeks, Nationwide contends that Erdman inappropriately questioned other employees about confidential salary information, encouraged others to work slowly to avoid driving up production standards, made malicious accusations against Getgen, and committed various other acts of insubordination. Erdman disputes these claims.

At the time Erdman accepted the full-time position, she sought clarification that Nationwide would honor her previously-approved request for vacation during the entire month of August, which Erdman had typically taken to prepare Amber for school. Nationwide informed Erdman that it was unlikely she would be allowed to take vacation in August because of the pressing need for full-time employees in light of the unusually large number of employees requesting vacation that month. Erdman announced that if she could not

use vacation time in August, she would request FMLA leave instead.

On April 14, 2003, Erdman began working full-time and a week later she submitted paperwork requesting FMLA leave from July 7 to August 29. A human resources employee responded to this request by telling Erdman that "as far as the FMLA, I probably don't see any problems with this."

Nationwide fired Erdman on May 9, 2003, citing her purported behavioral problems which culminated on May 8 when Erdman used profanity during a phone conversation that was monitored for quality control purposes. Company policy states that personal calls are not monitored, and Erdman prefaced a personal call with a profane disclaimer: "This is a personal call and should not be reviewed for quality purposes, assholes."

### B.

Alleging that Nationwide's stated motives were pretextual and that she was actually fired for requesting FMLA leave, Erdman brought federal claims under the FMLA and the Americans With Disabilities Act (ADA).[1] Initially, the District Court granted summary judgment on the FMLA claim, finding that Erdman could not establish a cause of action—either for interference or retaliation—because she had not accumulated the 1,250 hours necessary to qualify as an eligible employee under the statute. The District Court also granted summary judgment on the ADA claim, but only to the extent that it was based on a failure to accommodate theory. Nationwide was denied summary judgment on Erdman's ADA "association" claim.

---

1. Erdman also brought claims under the Pennsylvania Human Relations Act (PHRA) and for breach of contract. The District Court granted summary judgment to Nation-wide on the breach of contract claim and declined to exercise supplemental jurisdiction over the PHRA claim. Neither of these claims is at issue on appeal.

Nationwide filed a motion for reconsideration. After briefing and oral argument, the District Court reversed itself and granted Nationwide summary judgment on the ADA claim in its entirety, concluding that the ADA's "association" provision prohibits only employment decisions based on "unfounded stereotypes and assumptions against employees who associate with disabled people." *Erdman v. Nationwide Ins. Co.*, 621 F.Supp.2d 230, 235–36 (M.D.Pa.2007)(quoting *Den Hartog v. Wasatch Acad.*, 909 F.Supp. 1393, 1400 (D.Utah 1995)). Finding that Nationwide's actions were motivated by Erdman's prior modifications to her work schedule instead of stereotypes or unfounded assumptions, the District Court held Erdman could not establish an ADA "association" claim.

Erdman filed this timely appeal, arguing that the District Court erred in granting summary judgment on the FMLA and ADA claims. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

An employee is eligible for FMLA leave if she has worked "at least 1,250 hours of service with [her] employer during the previous 12 month period." 29 U.S.C. § 2611(2)(A). According to Erdman's records, she worked 1,298.25 hours in the relevant period, including 118.5 hours from home. In its calculation, the District Court excluded 57 hours worked from home prior to Erdman's September 2002 e-mail to Getgen asking whether she was allowed to work extra hours for use as "comp" time, and 20 hours worked from home after Getgen's January 2003 e-mail to Erdman admonishing her for doing fieldwork. The District Court found that Nationwide could not have had constructive notice of any hours Erdman worked from home prior to the September 2002 e-mail because Erdman had previously been told to "put in the hours that ... you're supposed to put in and nothing more than that." The District Court also found that constructive notice was dispelled by the January 2003 e-mail. Consequently, the District Court counted only 41.50 of the 118.50 hours Erdman worked from home in calculating the total number of hours she worked in the previous year, which left Erdman 28.75 hours short of FMLA's threshold requirement.

## A.

■ The first question is whether a reasonable jury could have concluded that Nationwide had actual or constructive notice that Erdman worked at least 1,250 hours, making her eligible under the FMLA. For FMLA purposes, all work that "the employer knows or has reason to believe ... is being performed" counts toward the threshold requirement. 29 C.F.R. § 785.12. The parties agree that hours worked off-site or beyond an employee's regular schedule count if "[the employer] knows or has reason to believe that an employee is continuing to work extra hours." 29 C.F.R. § 785.11. "[A]n employer need not have actual knowledge of such off-site work; constructive knowledge will suffice." *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir.1998).

Nationwide does not dispute that Erdman regularly worked outside of the office for many years, and that Sarno consistently authorized payment for these hours or allowed Erdman to use them as "comp" time. Nevertheless, Nationwide cites three reasons why it had no actual or constructive knowledge that Erdman continued to do so during the relevant time period. First, Sarno testified that when Erdman's position changed from exempt to non-exempt status in 2002, she told Erdman to "put in the hours that ... you're supposed to put in and nothing more than that." Second, Sarno was the only one with personal knowledge that Erdman

worked outside the office, and Sarno was replaced by Getgen in 2002. Finally, Getgen told Erdman in January 2003 that she was "not authorized to work outside [her] standard work hours."

Despite the superficial appeal of Nationwide's arguments, they fail to persuade because they do not account for Erdman's use of "comp" time. To be sure, Nationwide was on record that Erdman could not be paid for any additional hours. But this begs the question whether she could continue—as she had done for so many years in the past—to work outside the office to accrue "comp" time. After Erdman became a nonexempt employee in 2002, Sarno expressed concern about the number of hours that Erdman "put in." This could reasonably be interpreted to mean that Erdman was prohibited from "putting in" *any* hours for Nationwide outside of the office. Or, it could reasonably be interpreted to mean that Erdman would no longer be paid for more hours than she was scheduled to work on a weekly basis. Allowing Erdman to "put in" extra hours for later use in lieu of vacation would be entirely consistent with a desire to eliminate overtime pay, or to ensure salary uniformity. "Comp" time did not allow Erdman to earn overtime pay or increase her net salary; it merely allowed her to accumulate hours while working at home. Absent any clear indication to the contrary from Nationwide, a reasonable jury could conclude that the purpose of Sarno's communication was to prohibit Erdman from being paid for more hours than she was scheduled to work each week, without regard to whether Erdman could continue to accrue "comp" time.

Getgen's January 2003 e-mail to Erdman illustrates this point. Read in its entirety, the message has nothing to do with Erdman working from home or accumulating "comp" time. Getgen enumerated three specific concerns: unapproved overtime pay; unapproved visits to private residences; and employees in Erdman's position conducting fieldwork. This email does not preclude a reasonable jury from finding that Nationwide had actual or constructive knowledge of Erdman working from home to accrue "comp" time. There is no mention of "comp" time anywhere in the e-mail, and the message may be interpreted as entirely consistent with the company's continued acquiescence to Erdman's accrual of "comp" time.

Erdman's September 2002 e-mail to Getgen casts further doubt on Nationwide's claim that the company prohibited Erdman from accruing and using "comp" time. Therein, Erdman specifically asked about "comp" time in light of ambiguous communications regarding her hours. Nationwide never responded to this pointed inquiry, which raises an inference adverse to Nationwide's position. A similar negative inference may be drawn from the January 2003 meeting between Erdman and Getgen, in which Erdman claims that Getgen tacitly acquiesced to her continued accrual and use of "comp" time. Erdman's version of what transpired at this meeting could lead a reasonable jury to conclude that Nationwide had actual or constructive knowledge of Erdman's continued use of "comp" time.

Nationwide correctly notes that Erdman's subjective beliefs about company policy are irrelevant. The issue is not what Erdman thought, but what Nationwide communicated to her, and whether the company "acquiesced in [ ] the off-the-clock work." The record is equivocal on this point, however. A reasonable jury could find that Nationwide intended to categorically prohibit all work outside of the office, in which case Nationwide could not be charged with constructive knowledge that Erdman continued to work outside the office. *See Davis v. Food Lion*, 792 F.2d 1274, 1277 (4th Cir.1986) (holding

that employer did not have constructive knowledge of "secret" off-the-clock hours worked after repeated instructions not to do so). Nevertheless, a reasonable jury could also find that Nationwide intended to preclude Erdman from earning overtime, while allowing her to continue to accrue "comp" time.

Nor does the fact that Getgen replaced Sarno as Erdman's supervisor carry the day for Nationwide. First, the January 2003 meeting could show that Getgen had personal knowledge of Erdman's "comp" time practices after that point. Second, as previously discussed, Getgen's stated concerns about Erdman's hours are susceptible to an interpretation that is entirely consistent with the approval of "comp" time. Finally, even though Getgen may have lacked personal knowledge of Erdman's previous use of "comp" time under Sarno, that has no bearing on the knowledge imputed to Nationwide. It is undisputed that Sarno allowed Erdman to accrue and use "comp" time for many years. It is equally clear that in early 2002, Nationwide prohibited Erdman from working overtime for pay. What remains unclear, when we consider the record in the light most favorable to Erdman, is whether Nationwide required her to cease and desist her longstanding practice of accruing and using "comp" time.

■ Finally, we must address a policy concern raised by Nationwide. Erdman argues that her above-average productivity, coupled with the company's aggressive performance goals, evidence Nationwide's constructive knowledge of her extra hours. Nationwide objects that drawing such an inference would effectively impute constructive knowledge of undocumented hours whenever an employer "established aggressive productivity standards or encountered a particularly good employee."

It is conceivable that stellar productivity may be probative of an employer's con-structive knowledge of extra work hours in rare cases, but in this case the argument is foreclosed by Erdman's reliance on "comp" time. Because every hour of "comp" time is effectively exchanged for an hour of paid vacation at some point in the future, Erdman could work no more than her scheduled hours in the long run. Therefore, Erdman's productivity cannot reflect constructive notice of extra hours on Nationwide's part.

In sum, when read in the light most favorable to Erdman, the record indicates that a reasonable jury could conclude that Nationwide had constructive notice of hours that Erdman worked from home until February 10, 2003, when Erdman concedes that Getgen finally addressed the issue and prohibited her from accruing and using "comp" time. Counting all of the hours that Erdman worked at home prior to that date, the record indicates that Erdman accumulated 1,282.25 total hours in the year before her requested leave was scheduled to begin. Therefore, Erdman was eligible for FMLA leave for purposes of summary judgment.

### B.

Having determined that Erdman is an eligible employee for purposes of summary judgment, we shall address two alternative arguments because they will affect the District Court's instructions to the jury.

#### 1. Can Erdman Claim "Remedial Eligibility"?

■ Erdman argues that 29 C.F.R. § 825.110(d) renders her eligible for FMLA leave regardless of how many hours she worked because Nationwide failed to notify her of her eligibility. The version of § 825.110(d) in effect at the time of Erdman's dismissal stated: "[i]f the employer fails to advise the employee whether the employee is eligible prior to the date the requested leave is to commence, the employee will be deemed eligible."

In spite of the plain language of § 825.110(d), the District Court rejected Erdman's argument, citing decisions from courts of appeals that have invalidated the regulation as expanding FMLA eligibility beyond the statutory language. *See, e.g., Brungart v. BellSouth Telecomms., Inc.,* 231 F.3d 791 (11th Cir.2000); *Dormeyer v. Comerica Bank,* 223 F.3d 579 (7th Cir. 2000). Erdman cites no authority to support a contrary conclusion, but she urges us to disagree with our sister circuits and uphold the regulation.

We find persuasive the Seventh Circuit's analysis of this question in *Dormeyer*:

Although the Department of Labor has, like other administrative agencies, the authority to issue regulations to carry out the duties that Congress has assigned to it in [the FMLA], it has no authority to change the Act. But that is what the regulation tries to do. It does not address an interpretive issue that the statute leaves open, and so the principle of the *Chevron* case is not in play. The statutory text is perfectly clear and covers the issue. The right of family leave is conferred only on employees who have worked at least 1,250 hours in the previous 12 months. Yet under the regulation a worker who had worked 8 hours before seeking family leave would be entitled to family leave if the employer neglected to inform the employee promptly that he or she was ineligible. And this regardless of whether the employee had incurred any detriment as a result of the employer's silence.

223 F.3d at 796 (internal citations omitted).

For the reasons stated in *Dormeyer,* we hold that the version of § 825.110 in effect at the time of Erdman's dismissal was invalid. By requiring one to work at least 1,250 hours in the previous twelve months, Congress has defined those who are entitled to FMLA leave. The remedial eligibility provision of § 825.110(d) purported to give otherwise non-eligible employees a cause of action for an employer's failure to respond to an application for FMLA leave in contravention of the statute.

■ Our conclusion is consistent with the recent amendment to § 825.110, which removed the remedial eligibility provision in light of the Supreme Court's pronouncement that a remedial eligibility provision in 29 C.F.R. § 825.700 was invalid for similar reasons. *See Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 96, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002) ("[Section] 825.700(a) effects an impermissible alteration of the statutory framework and cannot be within the Secretary's power to issue regulations 'necessary to carry out' the Act."); 73 Fed.Reg. 67,394, 67,942 (Nov. 17, 2008) ("The final rule [ ] adopts the proposed changes in paragraphs (c) and (d), deleting the 'deeming' provisions. In light of the Supreme Court's decision in *Ragsdale,* the Department believes that it does not have regulatory authority to deem employees eligible for FMLA leave who do not meet the 12–month/1,250–hour requirements, even where the employer fails to provide the required eligibility notices."). Accordingly, Erdman cannot assert FMLA eligibility under § 825.110(d); she can only be deemed eligible if the jury finds that she worked the requisite number of hours.[2]

---

**2.** Erdman also argues that eligibility is not required for FMLA retaliation claims. She takes this position "based upon the expansiveness of the law against retaliation set forth in *Burlington Northern and Santa Fe R.R. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)," a Title VII case that made no mention of the FMLA. But Erdman conceded that eligibility is required for both interference and retaliation claims while opposing summary judgment. She claims the

### 2. Must An Employee Take FMLA Leave To Prove A Retaliation Claim?

■ Nationwide argues that if Erdman is eligible for FMLA leave, she cannot recover on a retaliation theory because she did not actually take leave.

We begin by noting that it would be patently absurd if an employer who wished to punish an employee for taking FMLA leave could avoid liability simply by firing the employee before the leave begins. But the question is not whether an employer may escape liability altogether; the question is whether such action constitutes interference with the employee's FMLA rights, retaliation against the employee, or both.

Three provisions collectively form the basis of liability under FMLA. Two subsections of 29 U.S.C. § 2615(a), entitled "Interference with [FMLA] rights," state:

(1) Exercise of rights

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

In addition, 29 C.F.R. § 825.220(c) prohibits employers from "discriminating against employees or prospective employees who *have used* FMLA leave." (emphasis added).

The District Court noted that "FMLA interference claims are derived from 29 U.S.C. § 2615(a)(1)," and that "[t]o succeed on an interference claim, a plaintiff must demonstrate that he or she was entitled to and denied some benefit under the FMLA." *Erdman v. Nationwide Ins. Co.,* 510 F.Supp.2d 363, 370 n. 4 (M.D.Pa.2007). Retaliation claims, the District Court stated, "arise under 29 U.S.C. § 2615(a)(2)." *Id.* at 370 n. 5. "To assert a retaliation claim, a plaintiff must demonstrate that: (1) he or she is protected under the FMLA, (2) he or she suffered an adverse employment action, and (3) the adverse action was causally related to the plaintiff's exercise of his or her FMLA rights." *Id.* (citing *Conoshenti v. Pub. Serv. Elec. & Gas Co.,* 364 F.3d 135, 146 (3d Cir.2004)). Under the District Court's statement of the law, Erdman's retaliation claim is valid because commencing leave *is* not a prerequisite.

Nevertheless, Nationwide astutely observes that the elements stated by the District Court differ slightly from our pronouncement in *Conoshenti.* In that case, we said that the first requirement of a retaliation claim is that "[an employee] took an FMLA leave," *Conoshenti,* 364 F.3d at 146, not that she "be protected under the FMLA," *Erdman,* 510 F.Supp.2d at 370 n. 4. We noted that "[t]he circuits have taken divergent paths in analyzing claims that an employee has been discharged in retaliation for *having taken* an FMLA leave," with some circuits finding that such claims arise under § 2615(a)(2) and others holding that §§ 2615(a)(1), 2615(a)(2), and 29 C.F.R. § 825.220(c) all give rise to retaliation claims. *Conoshenti,* 364 F.3d at 147 n. 9 (emphasis added). We concluded that the Ninth Circuit appropriately "predicated liability in such situations on § 825.220(c)," instead of §§ 2615(a)(1) or (a)(2). *Id.*[3]

right to raise the issue now not because of procedural inequity in the proceedings below or because of a change in the law, but rather because of "further reading" while preparing this appeal. We need not address this issue because Erdman has waived it. *See Delaware Nation v. Pennsylvania,* 446 F.3d 410, 416 (3d Cir.2006).

**3.** Soon after *Conoshenti* was decided, the First Circuit agreed that FMLA retaliation

Nationwide argues that because the regulation protects "employees who have used FMLA leave," § 825.220(c), and because *Conoshenti* held that "to be successful on this claim, [an employee] must show [ ] that he took an FMLA leave," 364 F.3d at 146, an employee cannot establish a retaliation claim unless she actually commenced leave. Although *Conoshenti*'s language supports Nationwide's argument, it is not clear whether firing an employee for requesting FMLA leave should be classified as interference with the employee's FMLA rights, retaliation against the employee for exercising those rights, or both.[4] Significantly, *Conoshenti* did not involve an employee, like Erdman, who requested FMLA leave but was fired before the leave was scheduled to begin.

Nationwide has cited only one case to support its broad reading of *Conoshenti.* *See Reid–Falcone v. Luzerne County Cmty. Coll.,* No. 3:CV–02–1818, 2005 U.S. Dist. LEXIS 12713, 2005 WL 1527792 (M.D.Pa. Jun.28, 2005). But contrary to Nationwide's interpretation, *Reid–Falcone* does not stand for the proposition that an employee must actually commence leave to state a retaliation claim. Rather, *Reid–Falcone* held that an employee fired after requesting maternity leave—as opposed to FMLA leave—could not state an FMLA claim based on retaliation because she had

"fail[ed] to invoke the protections of FMLA." *Id.* at *26. The fact that her leave had not commenced was irrelevant to the Court's decision. Indeed, *Reid–Falcone* indicates that the critical issue is *invocation* of FMLA rights, which contradicts Nationwide's reading of *Conoshenti.*

■ Simply put, this Court has never held that an employee fired after requesting FMLA leave but before the leave begins cannot recover for retaliation, and Nationwide cites none of our precedents other than *Conoshenti* to support this proposition. Reading *Conoshenti* as Nationwide urges would perversely allow a employer to limit an FMLA plaintiff's theories of recovery by preemptively firing her. Accordingly, we interpret the requirement that an employee "take" FMLA leave to connote invocation of FMLA rights, not actual commencement of leave. We therefore hold that firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee.[5]

### III.

■ Finally, we consider the District Court's summary judgment for Nationwide on Erdman's ADA claim. Erdman concedes that she cannot directly invoke ADA

---

claims must arise under § 825.220(c). *Colburn v. Parker Hannifin/Nichols Portland Division,* 429 F.3d 325, 331 (1st Cir.2005) (citing *Conoshenti* ).

**4.** The First Circuit has noted that retaliation and interference theories might overlap in some circumstances. *Colburn,* 429 F.3d at 331 ("[C]ourts have disagreed about whether 'interference' refers to a category of claims separate and distinct from those involving retaliation, or whether it describes a group of unlawful actions, of which retaliation is a part. The term 'interference' may, depending on the facts, cover both retaliation claims and non-retaliation claims. The distinction would

matter if the standards of proof used turned on which statutory section were pled, rather than on the nature of the facts and the theory of the case.") (citing, *inter alia, Conoshenti* ).

**5.** As for her retaliation claim, Erdman argues that the law of the case doctrine prohibits Nationwide from disputing the protected activity element of her FMLA claim because it is identical to the protected activity element of her PHRA claim, which the District Court allowed to proceed under a retaliation theory. *Erdman,* 510 F.Supp.2d at 374–75. We express no opinion on this argument so the District Court may consider the issue upon remand.

protection because she is not disabled. Rather, she relies on the ADA's association provision, which prohibits

excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.

42 U.S.C. § 12112(b)(4).

■ We first note that the association provision does not obligate employers to accommodate the schedule of an employee with a disabled relative. Although refusal to "mak[e] reasonable accommodations" may constitute illegal discrimination against a disabled *employee,* 42 U.S.C. § 12112(b)(5), the plain language of the ADA indicates that the accommodation requirement does not extend to *relatives* of the disabled. *See* 29 C.F.R. § 1630.8, Appendix ("It should be noted [ ] that an employer need not provide the applicant or employee without a disability with a reasonable accommodation because that duty only applies to qualified applicants or employees with disabilities."). *See also Den Hartog v. Wasatch Academy,* 129 F.3d 1076, 1084 (10th Cir.1997) ("[T]he plain language of [§§ 12112(b)(5)(A) and (B) ]— the only two provisions requiring 'reasonable accommodation' in Title I of the ADA—suggests that only job applicants or employees, but not their relatives or associates, need be reasonably accommodated."); *Larimer v. IBM,* 370 F.3d 698, 700 (7th Cir.2004) ("[T]he right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person.") (citing *Den Hartog* ).

The question is therefore whether Erdman has adduced sufficient evidence from which a reasonable jury could infer that Nationwide terminated her *because of* her daughter Amber's disability. Under the association provision, there is a material distinction between firing an employee because of a relative's disability and firing an employee because of the need to take time off to care for the relative. The statute clearly refers to adverse employment actions motivated by "the known disability of an individual" with whom an employee associates, as opposed to actions occasioned by the association. Therefore, Erdman must show that Nationwide was motivated by Amber's disability rather than by Erdman's stated intention to miss work; in other words, that she would not have been fired if she had requested time off for a different reason.[6] *See Den Hartog,* 129 F.3d at 1085 (requiring association provision plaintiffs to show that an "adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision"); *id.* at 1083 (recognizing that dismissal for absence or tardiness is not actionable "even if the reason for the absence or tardiness is to care for [a disabled relative]") (quoting H.R.Rep. No. 101–485, pt. 2, at 61–62 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 344).

Other courts have surmised that an employee would be protected by the association provision if she were fired because her employer feared that she *might* miss work to care for a disabled relative even though she had not taken or requested time off. *See Oliveras–Sifre v. Puerto Rico Dep't of Health,* 214 F.3d 23, 26 (1st Cir.2000) ("[The association provision prohibits termination] based on 'unfounded stereotypes and assumptions' arising from the employee's relationships with particular disabled

---

6. Of course, Nationwide may be liable under FMLA for firing Erdman because of her request for time off.

persons.") (quoting *Barker v. Int'l Paper Co.*, 993 F.Supp. 10, 15 (D.Me.1998)); *Tyndall v. Nat'l Educ. Centers*, 31 F.3d 209, 214 (4th Cir.1994) (noting that termination "based on any assumption regarding future absences related to [a relative's] care" gives rise to liability, but that termination "result[ing] from [an employee's] record of past absences and [her] clear indication that she needed additional time off" does not). We agree with this view, which comports with the language of the statute, because a decision motivated by unfounded stereotypes or assumptions about the need to care for a disabled person may be fairly construed as "because of the ... disability" itself. § 12112(b)(4). *See* 29 C.F.R. § 1630.8, Appendix (noting that the association provision prohibits an employer from, *inter alia*, refusing to hire a job applicant because of the employer's unfounded belief "that the applicant would have to miss work or frequently leave work early in order to care for [a disabled] spouse").

In this case, the record is devoid of evidence indicating that Nationwide's decision to fire Erdman was motivated by Amber's disability. Indeed, Nationwide was aware of Amber's disability for many years before Erdman was fired. The most Erdman can hope to show is that she was fired for requesting time off to care for Amber (the basis for her FMLA claim), not because of unfounded stereotypes or assumptions on Nationwide's part about care required by disabled persons.

Erdman argues that *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011 (8th Cir. 2005) supports her claim, but her reliance on that decision is misplaced. *Strate* held that an exemplary employee who was fired while on maternity leave to care for her disabled newborn could state an ADA claim on an association theory. Erdman's case differs from *Strate* in crucial respects. In the first place, Strate's employer was overheard implying that her newborn's disability was a factor justifying termination. *Id.* at 1014. Second, *Strate* relied heavily on the "close temporal connection" between the employer's discovery of the child's disability and Strate's termination, *id.* at 1019, whereas Nationwide was aware of Amber's disability for years before Erdman's termination. Third, and most significantly, the employer's motivations in *Strate* amounted to unfounded assumptions about the need to care for a disabled child because although the employer knew about the disability, it had no reason to suspect that Strate would need additional time off beyond her originally scheduled maternity leave. The same is not true here, where Erdman was fired only after announcing her intention to take leave to care for Amber. Accordingly, *Strate* does not support Erdman's argument.

Because no reasonable jury could conclude that Erdman was fired "because of [Amber's] known disability," § 12112(b)(4), we will affirm the District Court's grant of summary judgment on Erdman's ADA claim.[7]

7. We note that a plaintiff may prevail under the association provision in other circumstances not at issue in this case. For example, the Seventh Circuit requires an association provision plaintiff to show "that his case falls in one of the three categories in which an employer has a motive to discriminate against a nondisabled employee who is merely associated with a disabled person." *Larimer*, 370 F.3d at 702. *Larimer* described these categories as: (1) termination based on a disabled relative's perceived health care costs to the company; (2) termination based on fear of an employee contracting or spreading a relative's disease; and (3) termination because an employee is somewhat distracted by a relative's disability, yet not so distracted that he requires accommodations to satisfactorily perform the functions of his job. *Id.* at 700. *See also* 29 C.F.R. § 1630.8, Appendix (noting that the association provision prohibits an employer from firing an employee because of a fear that his volunteer work with AIDS sufferers may cause the employee to contract

## IV.

For the foregoing reasons, we will affirm the District Court's summary judgment on Erdman's ADA claim, but will vacate the summary judgment on Erdman's FMLA claim, and remand the case for further proceedings consistent with this opinion.

the disease himself, or from reducing an employee's health benefits because of a disabled relative). Erdman asserts none of these theories.