**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-4625
_____

VANESSA BUDHUN,

Appellant

v.

READING HOSPITAL AND MEDICAL CENTER

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 10-cv-06921)
District Judge: Hon. Lawrence F. Stengel

Submitted Pursuant to Third Circuit LAR 34.1(a)
February 10, 2014

Before: CHAGARES, SHWARTZ, and ALDISERT,
<u>Circuit Judges</u>.

(Filed: August 27, 2014)

Justin L. Swidler, Esq.
Swartz Swidler
1101 Kings Highway North
Suite 402
Cherry Hill, NJ 08034
    <u>Counsel for Appellant</u>

Vincent Candiello, Esq.
Post & Schell
17 North 2nd Street
12th Floor
Harrisburg, PA 17101
    <u>Counsel for Appellee</u>

———————

OPINION

———————

CHAGARES, Circuit Judge.

Vanessa Budhun appeals the District Court's grant of summary judgment to her employer, The Reading Hospital and Medical Center ("Reading") on her Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2691, et seq., interference and retaliation claims. She also appeals the District Court's denial of her motion for leave to amend her complaint to add a claim for violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq. For the reasons that follow, we will vacate the judgment of the District Court with respect to her FMLA claims and affirm the District Court's denial of her motion for leave to amend her complaint.

I.

The following facts are undisputed unless otherwise noted. In 2008, Budhun was hired by Berkshire Health Partners ("BHP"), an affiliate of Reading, as a credentialing assistant. The written job description for this position required her to generate and maintain records, and to demonstrate "efficiency and accuracy in the credentialing" of network healthcare providers. Appendix ("App.") 140. The written job description noted that the job required preparing and mailing credentialing packets, processing and verifying credentialing information, performing data entry, scanning, and similar tasks. App. 140-43. Budhun estimated that approximately sixty percent of her job was typing, a figure Reading does not contest. App. 82. Budhun's direct supervisor was Sherri Alvarez; Alvarez reported to the director of the credentialing department, Dawn Dreibelbis.

In accordance with applicable law, Reading provides its employees with up to twelve weeks of job-protected FMLA leave during any rolling twelve-month period. Reading requires employees to submit a leave certification from a healthcare professional prior to approving any FMLA

2

leave. App. 155. It also requires employees to submit a "fitness-for-duty" certification in the form of a return to work form that confirms that the employee can work "without restriction" before returning. App. 159. If an employee does not contact Reading's human resources department at the end of his or her leave, Reading's policy states that it will consider the employee to have voluntarily resigned. Id.

Reading also has a transfer policy which prohibits employees who have been disciplined by a final written warning in the last year from transferring to another position within Reading. App. 151. As is pertinent to this appeal, Budhun received a final written warning on January 25, 2010 for tardiness.

Prior to taking the FMLA leave that is the subject of this suit, Budhun took approximately four weeks of FMLA leave in two separate segments between March 31, 2010 and May 7, 2010. During this period of time, Ann Rushow, an employee from a different department, filled in for Budhun part of the time. Rushow remained in this part-time role upon Budhun's return.

Budhun broke her fifth metacarpal, the bone in her hand connecting her wrist to her pinky finger, on July 30, 2010 in an incident unrelated to her job. She arrived at work on Monday, August 2, 2010 with a metal splint on her right hand. At 10:33 a.m. that day, she received an email from Stacey Spinka, a Reading human resources employee, stating "Your supervisor has made us aware that you have an injury that prevents you from working full duty," and providing Budhun with FMLA leave forms. App. 244. Budhun apparently then left work and saw a physician assistant at OAA Orthopedic Specialists that same day. App. 253.

Budhun returned to OAA and saw Dr. Richard Battista on August 3 and August 10, 2010. Dr. Battista taped the pinky, ring, and middle fingers on her right hand together to stabilize her pinky finger. According to Budhun, she asked Dr. Battista to fill out the FMLA leave certification form. She told Dr. Battista that her job required typing, and that she felt she could type with the five fingers on her left hand, and her thumb and index finger on her right hand. App. 315.

3

On August 12, 2010, Budhun emailed Spinka some of the FMLA paperwork that she had been provided. App. 429. Although the record is not entirely clear, it appears that Budhun attached to her email a portion of the hospital's leave of absence form and a note from her doctor. The note was dated August 10, 2010 and provided that she could return to work on Monday, August 16, 2010, stating, "No restrictions in splint." In her email, Budhun clearly stated that she was going to return on Monday.

Budhun returned to her place of work at BHP as promised on August 16, 2010. At 11:06 a.m., Budhun emailed Spinka again, attaching the other portion of the hospital's leave of absence form. App. 431. This form stated an expected return to work date of August 16, 2010. App. 263. Budhun stated that she provided the FMLA leave certification to Dr. Battista on August 3, and that he said it would take ten to fifteen days to complete. Also attached to this email was a form giving Reading authorization to contact Budhun's medical providers should it need to clarify any of the information that Budhun provided. App. 265.

In this email, Budhun stated that she still had a splint on her right hand, but that she could "type slowly and write a little bit, but not as fast as I used to. . . . I could work but not fast." App. 431. Spinka replied at 11:25 a.m., informing Budhun that because her return to work note "states 'no restrictions', therefore you should be at full duty (full speed) in your tasks. If you are unable to do so, you should contact your physician and ask him to write you and [sic.] excuse to stay out of work until you may do so." Id. Budhun responded six minutes later, stating that she could "use my index and thumb finger of that [right] hand so I can't go at full speed, but I could work." App. 430. Spinka again replied and informed Budhun that she needed to perform at the "same capacity" as she did prior to going on leave and that she should have full use of all her digits in order to be considered full duty. Id. "It seems that your physician was incorrect in stating that you could work unrestricted. If you were truly unrestricted in your abilities, you would have full use of all your digits." Id. The record does not indicate

4

whether this was the last conversation between Budhun and Spinka or anybody else at the hospital that morning.

What is clear is that Budhun, under the impression that Reading would not permit her to work with three fingers in her right hand incapacitated, then left her place of work and went back to Dr. Battista's office.  At 1:34 p.m. on that same day, August 16, Dr. Battista's office faxed Budhun's completed FMLA leave certification form to Reading.  App. 271.  In it, Dr. Battista checked "yes" next to the question asking whether Budhun was unable to perform "any of his/her job functions."  App. 272.  In the field below this question, which asked which job functions Budhun could not perform, Dr. Battista simply wrote "out of work until 08/16/10."  Id. On the next page, Dr. Battista estimated the period of incapacity as "08/02/10-08/16/10."  App. 273.  Dr. Battista signed and dated the FMLA leave certification form on that same day, August 16, 2010.

The final page in Dr. Battista's fax was, however, somewhat inconsistent with all of the information he had previously given.  The last page consisted of a one line note, stating, "[p]lease excuse patient from work until reevaluation on 9/8/2010."  App. 275.  This note was signed and dated August 16, 2010 as well.  The next day, Reading approved FMLA leave for Budhun from August 2, 2010 through September 8, 2010.  App. 276.

Budhun remained out of work on FMLA leave.  Dr. Battista evaluated her again on September 8, 2010, prescribed occupational therapy for her hand, and scheduled a follow-up appointment for November 9, 2010.  Budhun emailed Spinka and Alvarez that day, informing them that the doctor would release her to work as soon as she could move her fingers without problems.  App. 340.  Spinka responded that because Budhun's approved FMLA leave expired on September 8, Reading would need a note from Budhun's doctor.  Budhun faxed Spinka a note dated September 10, 2010, in which Dr. Battista stated that Budhun would be out of work until her next doctor's appointment in November.  App. 280.  Spinka then extended Budhun's FMLA leave until September 23, 2010 (the date at which her twelve weeks of allotted FMLA

5

leave was exhausted), and approved non-FMLA leave through November 9, 2010. App. 287-88.

Budhun emailed Spinka again on September 13, informing her that the "doctor" had informed her that he would release her to work prior to November if she felt better. App. 283. In this email, she stated that she thought she would be able to work by the end of the month. Id. Budhun attended several more occupational therapy sessions throughout the remainder of September.

On September 15, 2010, Alvarez, Dreibelbis, Spinka, Chuck Wills, the President and CEO of BHP, and Gretchen Shollenberger, the director of human resources, had a meeting. According to Alvarez, the purpose of the meeting was to discuss what BHP would do if Budhun did not return from leave by September 23, 2010. The meeting participants agreed that if Budhun did not return to work by that date, they would offer Budhun's job to Rushow. App. 394, 405. When Budhun did not return by the end of her FMLA leave, BHP offered the position to Rushow on September 25, 2010. Rushow accepted.

After replacing Budhun, Dreibelbis and Alvarez attempted to contact her on September 27 and 28 but were unable to reach her. On September 29, Budhun emailed them and informed them that she would be able to secure a return to work note the following day, and be able to return to work on October 4, 2010. App. 329. Alvarez and Spinka called Budhun on that day and informed her that they had replaced her with Rushow. App. 320. Budhun was not eligible to transfer to another position within the hospital because of her prior written discipline. She was told that if her doctor released her to work before she found another position at the hospital (even though she would have to apply as though she were an outsider), she would be terminated. App. 321. Alvarez emailed her on October 6, 2010, asking her to come pick up her belongings and turn in her identification badge and keys. App. 328.

Budhun remained on leave, continuing to be eligible for fringe benefits, through November 9, 2010. At the expiration of her leave, she did not contact Reading. Reading

6

considered her to have voluntarily resigned at the end of her leave, consistent with its internal leave policy. App. 159.

Budhun brought suit on November 19, 2010, alleging FMLA interference and retaliation claims. After discovery closed, Reading moved for summary judgment on both of Budhun's claims, and the District Court granted the motion. It held that Reading was entitled to summary judgment on Budhun's interference claim because "[s]he was never medically cleared to return to work and . . . a doctor's note was never provided to defendant." App. 16. It also concluded that Budhun was never entitled to the protections of the FMLA because she claimed that she was fully capable of working at the time that she attempted to return to work on August 16, 2010. Id. The District Court granted summary judgment on Budhun's retaliation claim because it determined that Budhun could not establish a prima facie case as a matter of law. It held that Budhun suffered no adverse employment action because Budhun was medically unable to return to work at the conclusion of her FMLA leave. It also concluded that Budhun could not establish any temporal nexus between her termination and her FMLA leave because "Budhun was terminated on November 10, 2010 almost two months after she took FMLA." App. 18. Budhun timely appealed.

II.

The District Court had federal question jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction over the final decision of the District Court pursuant to 28 U.S.C. § 1291. We exercise plenary review of an order granting summary judgment and apply the same standard that the District Court applied. Jakimas v. Hoffmann–La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007). Summary judgment is appropriate only if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the facts in the light most favorable to the non-moving party. Moore v. City of Phila., 461 F.3d 331, 340 (3d Cir. 2006). The initial burden is on the party seeking summary judgment to identify evidence that demonstrates an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, then it falls to

the non-moving party to present evidence on which a jury could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## III.

The FMLA was enacted, in part, to "balance the demands of the workplace with the needs of families," and "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1), (2). It requires certain employers to provide their employees with up to twelve weeks of leave in the event that the employee has a serious medical condition. Id. § 2612(a)(1)(D). An employer faces liability under the Act and its implementing regulations if it interferes with a right that the Act guarantees, or if it retaliates against an employee for invoking the Act's protections. Id. § 2615(a)(1); 29 C.F.R. § 825.220(c).[1] There is no dispute that Reading is an employer that was required to make FMLA leave available, that Budhun was eligible for FMLA leave, or that her hand injury qualified as a serious medical condition. Budhun argues that the District Court's grant of summary judgment to Reading on her FMLA interference and retaliation claims was in error. We agree.

## A.

Budhun contends that she adduced enough evidence to create a genuine dispute of material fact regarding whether Reading interfered with her right to be restored to her position on August 16, 2010, the day Spinka told her that she needed full use of all ten fingers before she could be reinstated despite the fact that there was no essential function of her job

---

[1] All citations to the Code of Federal Regulations are to the FMLA regulations that were in effect in 2010, when the facts relevant to this case occurred. See Chase Bank USA, N.A. v. McCoy, 131 S. Ct. 871, 878 (2011) ("Our analysis begins with the text of [the regulation] in effect at the time this dispute arose."). The Department of Labor amended some of the FMLA regulations in 2013. See Final Rule, 78 Fed. Reg. 8834-01 (Feb. 6, 2013).

8

that she could not perform. She claims that this action interfered with her right to be restored to her position.

The FMLA provides that it "shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" that it guarantees. 29 U.S.C. § 2615(a)(1); see also 29 C.F.R. § 825.220(b) (noting that violations of the regulations are actionable as well). In order to assert an FMLA interference claim, an employee "only needs to show that [1] he was entitled to benefits under the FMLA and [2] that he was denied them." Callison v. City of Phila., 430 F.3d 117, 119 (3d Cir. 2005).[2] One of the rights that it guarantees is "to be restored by the employer to the position of employment held by the employee [or an equivalent position] when the leave commenced" upon return from FMLA leave. 29 U.S.C. § 2614(a)(1). "An employee may not be required to take more FMLA leave than necessary to resolve the circumstance that precipitated the need for leave." 29 C.F.R. § 825.311(c).

1.

Reading argues that Budhun did not really attempt to return to work on August 16, 2010 because shortly after

---

[2] We have more recently phrased this test in a manner similar to the way other courts of appeals have. In Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014), we held that in order to "make a claim of interference under the FMLA, a plaintiff must establish: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." See also Goelzer v. Sheboygan Cnty., Wis., 604 F.3d 987, 993 (7th Cir. 2010) (delineating the elements in a similar way). We note that the first four elements of this longer test largely collapse into the first element of the Callison formulation because in order to be entitled to benefits, an employee must be eligible for FMLA protections and leave, work for a covered employer, and provide sufficient notice.

arriving at BHP, she left and sought a note from Dr. Battista requesting leave until September 8, 2010. The record, however, indicates that there is a genuine dispute of material fact regarding whether Budhun attempted to invoke her right to return to work on that date. Budhun informed Spinka on August 12, 2010 that she intended to return to work on Monday, August 16. In the email where she conveyed this to Spinka, she attached a note from her treating physician, Dr. Battista, stating that she could return on that date and had "no restrictions." At the time she entered her place of work on August 16, all of the information that she had from her treating physician, and all of the information that she had provided to Reading, indicated that she intended to return to work as of that day, and could do so with "no restrictions."

Although we have never had occasion to address specifically what constitutes invocation of one's right to return to work, Budhun has adduced enough evidence such that a reasonable jury could find that she did so here. Her "fitness-for-duty" certification clearly stated that she could return to work with "no restrictions." Prior to permitting an employee to return to work, an employer may request that an employee provide such a certification, see id. § 825.312, as Reading required of Budhun here. In it, an employee's healthcare provider must merely certify that the employee is able to resume work. Id. § 825.312(b); see also Brumbalough v. Camelot Care Ctrs., Inc., 427 F.3d 996, 1003-04 (6th Cir. 2005) (interpreting a similar version of the regulation to require only a statement that the employee can return to work, nothing more). An employer may require that this certification address the employee's ability to perform the essential functions of her job, but only if the employer provides a list of essential functions to the employee at the time that the employer notices the employee that she is eligible for FMLA leave. 29 C.F.R. § 825.312(b). It is undisputed that Reading did not provide Budhun a list of essential functions for her to present to Dr. Battista. Because Reading did not provide Budhun with such a list, Dr. Battista's fitness-for-duty certification was based only on the description of the job that Budhun would have supplied him.[3]

---

[3] We do not reach the issue of whether an employer may ever decline to allow an employee, whose physician has been

Budhun stated that Dr. Battista specifically asked her if she felt able to type, and she responded that she thought she could.

Dr. Battista's communications were, admittedly, somewhat inconsistent. While he stated in Budhun's fitness-for-duty certification and her FMLA leave certification that she could return to work on August 16, 2010, he sent a separate note on August 16 stating that she should be excused from work until September 8. He did so, however, only after Spinka told Budhun that she could not return, questioned Dr. Battista's assessment that she could, and told her that she could not return to work until she had full use of all ten fingers.

The regulations contemplate just this kind of situation. They state that if the employer requires clarification of the fitness-for-duty certification, the employer can contact the employee's health care provider (as long as the employee gives the employer permission to do so, which Budhun did here). Id. § 825.312(b). However, the "employer may not delay the employee's return to work while contact with the health care provider is being made." Id. Instead of following the regulations, Spinka (who is not a doctor) seemingly overruled Dr. Battista's conclusion (albeit reached without an employer-provided list of essential job functions) by telling Budhun that if she was "truly unrestricted," she "would have full use of all of [her] digits." App. 267. The record is sufficient to allow a reasonable jury to conclude that Budhun attempted to invoke her right to return to work, and that Reading interfered with it when it told Budhun that she could not.

Our decision is in accord with the other courts of appeals that have considered the question of when an employer's duty to reinstate is triggered. In Brumbalough, the plaintiff obtained a note from her doctor stating that she could return to work, but could work up to only forty-five hours per week, and could not travel out of town more than

---

provided a list of essential functions and whose physician provided a fitness-for-duty certification, from returning to work.

11

once per week. 427 F.3d at 999. After her employer terminated her, she brought suit for interfering with her FMLA right to reinstatement. The Court of Appeals for the Sixth Circuit held that "once an employee submits a statement from her health care provider which indicates that she may return to work, the employer's duty to reinstate her has been triggered under the FMLA." Id. at 1004.

The Court of Appeals for the Seventh Circuit came to the same conclusion in James v. Hyatt Regency Chi., 707 F.3d 775 (7th Cir. 2013). There, the plaintiff presented his employer with several fitness-for-duty certifications from his doctor, although all of them contained job-related restrictions. The court held that the employer's duty to reinstate the plaintiff would have been triggered had the fitness-for-duty certifications provided that he could have returned to duty without restrictions. Id. at 780-81. Because none of the doctor's notes stated that he could work without restrictions, no duty was triggered as a matter of law. The difference between James and the instant case is apparent: Budhun's August 10, 2010 note from Dr. Battista stated that she could return with "no restrictions."

2.

Even if Budhun actually attempted to return to work on August 16, 2010, Reading argues that it is still entitled to summary judgment because it would have sent her home because she could not perform an essential function of her job. The failure to restore an employee to her position at the conclusion of her leave does not violate the FMLA if the employee remains unable to perform an "essential function" of the position. 29 C.F.R. § 825.216(c). The FMLA regulations incorporate guidelines set out in the ADA regulations that bear on whether a given function is "essential." Id. § 825.123(a). The pertinent ADA regulations define "essential functions" to be the "fundamental job duties" of the position, and set out a non-exhaustive list of evidence that a fact-finder may consider:

> (i) The employer's judgment as to which functions are essential;

12

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(1), (3). Importantly, whether a particular function is essential "is a factual determination that must be made on a case by case basis based upon all relevant evidence." Turner v. Hershey Chocolate U.S., 440 F.3d 604, 612 (3d Cir. 2006) (alteration and quotation marks omitted) (in the ADA context); see also Brumbalough, 427 F.3d at 1005 (same, in FMLA context); Sanders v. City of Newport, 657 F.3d 772, 782 (9th Cir. 2011) (same).

The FMLA regulations place the onus on an employee's health care provider — not her employer — to certify whether the employee is unable to perform any essential function of her job.[4] See 29 C.F.R. § 825.123(a) ("An employee is 'unable to perform the functions of the position' where the health care provider finds that the employee is unable to work at all or is unable to perform any one of the essential functions of the employee's position [within the meaning of the ADA regulations]." (emphasis added)). Reading was free to provide Budhun with a list of the specific functions that were essential to her job so that Dr.

---

[4] This certification triggers the employer's duty to reinstate only if it provides that the employee can return without restriction. Indeed, we have noted that "[t]he FMLA does not require an employer to provide a reasonable accommodation to an employee to facilitate his return to the same or equivalent position at the conclusion of his medical leave." Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 271 (3d Cir. 2012) (quotation marks omitted).

13

Battista could determine if Budhun could perform them, but it did not. Instead, Spinka unilaterally determined, over email, that Budhun could not perform an essential function because she had use of only seven fingers.

Budhun admitted that it was not likely that she could type as quickly with seven fingers as she formerly could with ten. But this alone does not mean that she could not perform this essential function. Budhun adduced evidence that there was no minimum words per minute requirement in her written job description. App. 311. Both the other employee who had Budhun's equivalent position, and her supervisor Alvarez, employed a "hunt and peck" method to type, utilizing only one finger on each hand. App. 310. With the use of ten fingers, Budhun was able to complete files in about seven days, far in advance of BHP's internal deadlines of sixty to ninety days. Combined with Dr. Battista's note, Budhun has adduced enough evidence to allow a reasonable jury to conclude that she could, in fact, perform this essential function.

3.

Reading also argues that it could not have interfered with Budhun's right to restoration on August 16, 2010, because she was not yet on FMLA leave at that time. Although she notified Reading on August 2 that she was seeking FMLA leave and completed all of her FMLA paperwork on August 16, it was not until August 17 that Reading approved it. Reading contends that Budhun was not eligible for FMLA benefits, including restoration, until it approved her leave.

We rejected a similar contention in the retaliation context in Erdman v. Nationwide Insurance Co., 582 F.3d 500 (3d Cir. 2009). There, the plaintiff informed her employer in April that she intended to take FMLA leave in the coming July and August. Id. at 503. Her employer terminated her in May and she brought suit for FMLA retaliation, alleging that her employer had terminated her for requesting FMLA leave. Nationwide argued that she could not state a retaliation claim because she was fired before her leave commenced, and that we had previously held that a required element of a prima

14

facie FMLA retaliation case was that an employee "took an FMLA leave." Id. at 508-09 (quoting Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004)).

We held that Nationwide's interpretation of our retaliation test was untenable. So holding would "perversely allow a[n] employer to limit an FMLA plaintiff's theories of recovery by preemptively firing her." Id. at 509. "Accordingly, we interpret[ed] the requirement that an employee 'take' FMLA leave to connote invocation of FMLA rights, not actual commencement of leave." Id.

The same reasoning applies here. A reading of the statute that denies all rights that the FMLA guarantees until the time that an employer designates the employee's leave as FMLA would be illogical and unfair. It would disempower employees taking any sort of short term unforeseen leave because it would allow employers to deny FMLA rights until the employer decided that the FMLA governed the employee's leave. As we held in Erdman, and consistent with Brumbalough and James, it is the time that an employee invokes rights under the FMLA that matters, not when his or her employer determines whether the employee's leave is covered by the FMLA.

Reading's argument also runs counter to the FMLA's regulatory scheme. The regulations provide that "'interfering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). They also prohibit "manipulation by a covered employer to avoid responsibilities under [the] FMLA." Id. This regulation makes clear that an employee's leave need not have been approved by his or her employer in order for an employee to invoke rights under the act because an employee can state an interference claim even if his or her leave is never approved.[5]

_____

[5] This interpretation is buttressed by the title of 29 C.F.R. § 825.220, "Protection for employees who request leave or otherwise assert FMLA rights." The plain language of the title indicates that its protections apply to employees who "request" leave, not just those whose leave has been

15

It appears undisputed that the date on which Budhun invoked the protections of the Act was August 2, 2010. Spinka acknowledged as much that day, when she emailed Budhun FMLA leave forms and asked her to complete them. Reading does not argue that Budhun was ineligible for FMLA leave on August 2 – in fact, on August 17, Reading approved Budhun's FMLA leave retroactive to August 2 and extending to September 8. Having invoked the FMLA, Budhun was eligible to avail herself of the right to return to her position at the end of her leave.

4.

The District Court's grant of summary judgment to Reading on Budhun's FMLA interference claim was in error. Genuine issues of material fact exist regarding whether Budhun was exercising her right to return to work on August 16, 2010, and whether she could not perform an essential function of her job.

B.

Budhun next contends that the District Court's grant of summary judgment to Reading on her FMLA retaliation claim was in error. She argues that Reading retaliated against her for taking FMLA leave when it impermissibly replaced her after her FMLA-protected leave expired. FMLA retaliation claims are rooted in the FMLA regulations. Erdman, 582 F.3d at 508. They prohibit an employer from "discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). FMLA retaliation claims based on circumstantial evidence are governed by the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012).

approved. Although a title alone is "not controlling," it can be instructive "when it sheds light on some ambiguous word or phrase." I.N.S. v. St. Cyr, 533 U.S. 289, 308-09 (2001) (alterations and quotation marks omitted).

16

Budhun's claim is based on circumstantial evidence. Thus, to succeed on her claim, it is her burden to establish that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." Lichtenstein, 691 F.3d at 302; see also Ross, -- F.3d --, 2014 WL 2724128, at *6. Once she establishes a prima facie case, the burden shifts to the defendant to provide evidence of a legitimate non-discriminatory reason for the adverse action. McDonnell Douglas, 411 U.S. at 802. If the employer meets this "minimal burden," the employee must then point to some evidence that the defendant's reasons for the adverse action are pretextual. Lichtenstein, 691 F.3d at 302.

The District Court granted summary judgment on Budhun's retaliation claim because it held that Budhun could not establish the second and third elements of her prima facie case. It stated that because she was unable to return to work at the conclusion of her FMLA leave, "her separation from employment was not an adverse employment action." App. 17. It also held that she could not establish any temporal nexus between her termination and her FMLA leave because "Budhun was terminated on November 10, 2010, almost two months after she took FMLA." App. 18. Because it held that Budhun could not establish a prima facie case as a matter of law, it did not reach Reading's alleged legitimate, non-discriminatory reason for replacing Budhun or Budhun's pretext arguments.

1.

The parties contest only the second and third elements of Budhun's prima facie case (it is undisputed that Budhun invoked her right to FMLA-qualifying leave). An "adverse employment action" is an action that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an

17

employee." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997) (quotation marks omitted).[6]

Reading argues that Budhun suffered no adverse employment action because she resigned voluntarily on November 10, 2010 when she failed to return to work. It contends that Reading continued to provide benefits to Budhun through November 9, 2010, the date her non-FMLA leave expired, in accordance with its internal policy. In her deposition, Budhun admitted that she was never told that she was "terminated" at the time she was told that she was replaced by Rushow. App. 112. Budhun never submitted a "fitness-for-duty" certification prior to her leave expiring on November 9, and admits that rather than applying for continued leave, she just "gave up." App. 110.

But viewing the facts in the light most favorable to Budhun, a reasonable jury could conclude that Budhun suffered an adverse employment action when Reading installed Rushow permanently in her position. Budhun was no longer free to return to her previous job. Alvarez expressly told her to turn in her badge and keys, and to pick up her personal belongings, which a Reading employee had packed into a box. She was not offered another position at the hospital (indeed, she was ineligible to transfer to another position). This certainly altered her "privileges of employment," as she could no longer even enter her place of work. She was expressly told that if her doctor cleared her to return to work that she would be formally terminated. There

---

[6] This Court has not decided whether to apply the less restrictive standard for "adverse employment action" promulgated in the Title VII context by Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006). Under this more relaxed standard, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," such that the action well might have dissuaded a reasonable worker from taking a protected action. Id. at 68. We need not resolve this question today because, as the subsequent discussion illustrates, termination, or being permanently replaced, meets the more restrictive definition.

was no position for her to return to at the hospital. Such a complete elimination of responsibility "significantly altered [her] duties and status." Caver v. City of Trenton, 420 F.3d 243, 256 (3d Cir. 2005).

That Budhun may not have been formally "terminated" and continued to receive benefits from Reading does not mean that the actions that Reading took short of termination were not "adverse employment actions." We have never required formal termination to be a necessary element of such an action. Even under the Robinson formulation of adverse employment action, much less has often sufficed. See, e.g., Caver, 420 F.3d at 256 (holding that transfer to light duty with less prestige is considered an adverse employment action); Weston v. Pennsylvania, 251 F.3d 420, 430-31 (3d Cir. 2001) (holding that adverse employment actions can include suspension without pay, change of work schedule, or reassignment). Budhun has adduced enough evidence such that a reasonable jury could conclude that she suffered an adverse employment action when she was replaced.

2.

Reading also argues that Budhun has not established a causal link between her FMLA leave and any adverse employment action. Whether a causal link exists "must be considered with a careful eye to the specific facts and circumstances encountered." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 n.5 (3d Cir. 2000). We have been reluctant to infer a causal connection based on temporal proximity alone. See Weston, 251 F.3d at 431. To demonstrate a causal connection, a plaintiff generally must show "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). Employers "cannot use the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c).

Reading's argument with respect to this third prong of Budhun's prima facie case heavily tracks its argument with respect to prong two. It contends that because its separation

19

with Budhun did not occur until November, there was nothing unusually suggestive about its timing. But viewing the facts in the light most favorable to Budhun forecloses this argument, because Reading's decision to replace her in September was an adverse employment action. The record demonstrates that Reading decided to replace Budhun before her FMLA leave ended, as early as September 15, 2010. Rushow was then offered and accepted the position on September 25, two days after Budhun's FMLA leave ended. Alvarez and Spinka attempted to contact Budhun regarding her replacement starting on September 27, and finally reached her on September 29. We have held that such close temporal proximity qualifies as unusually suggestive timing. See, e.g., Lichtenstein, 691 F.3d at 307 (determining that termination less than a week after the plaintiff invoked her right to FMLA leave established causation); see also Wierman v. Casey's Gen. Stores, 638 F.3d 984, 1000 (8th Cir. 2011) (holding that termination several days after the plaintiff took FMLA-covered leave was sufficient to establish causation); Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007) (holding that an employee who was notified of her termination three months after requesting FMLA leave and the day she was scheduled to return to work was sufficient to establish a causal connection).

3.

The District Court thus erred in concluding that Budhun could not establish a prima facie case of FMLA retaliation as a matter of law. Because the District Court did not reach the subsequent steps in the McDonnell Douglas analysis, we will not either. The District Court can address Reading's proffered legitimate, non-discriminatory reason and Budhun's evidence of pretext upon remand.

IV.

Budhun also appeals the District Court's denial of her motion for leave to amend her complaint. Budhun moved to add a claim under the ADA on May 17, 2011. Her proposed amended complaint alleged that Reading regarded her as being disabled. The District Court denied Budhun's motion as futile.

20

We review the denial of leave to amend for abuse of discretion. Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004). In the context relevant here, a party may amend its pleadings "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Although a court should grant such leave freely "when justice so requires," id., a court may deny leave to amend when such amendment would be futile. Arthur v. Maersk, Inc., 434 F.3d 196, 204 (3d Cir. 2006). Amendment would be futile if the amended complaint would not survive a motion to dismiss for failure to state a claim. Travelers Indem. Co. v. Dammann & Co., 594 F.3d 238, 243 (3d Cir. 2010). A complaint fails to state a claim upon which relief can be granted where the plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

We have little trouble concluding that the District Court did not abuse its discretion in denying leave to amend. The ADA's definition of "disability" includes "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(C).[7] An individual meets this "regarded as" requirement if he or she establishes that he or she has been subject to an action the ADA prohibits "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." Id. § 12102(3)(A).

The statute curtails an individual's ability to state a "regarded as" claim if the impairment is "transitory and minor," which means it has an "actual or expected duration of six months or less." Id. § 12102(3)(B). Whether an impairment is "transitory and minor" is to be determined objectively. 29 C.F.R. § 1630.15(f). That is to say, the relevant inquiry is whether the impairment that the employer perceived is an impairment that is objectively transitory and

_____

[7] Budhun originally moved to amend her complaint to assert both an actual disability claim and a "regarded as" disabled claim. On appeal, she contends that the District Court erred only in failing to permit her to add a "regarded as" claim. See Budhun Br. 24.

minor.[8]   The ADA regulations list being "transitory and minor" as a defense to an ADA claim.  Id.  While ordinarily a party may not raise affirmative defenses at the motion to dismiss stage, it may do so if the defense is apparent on the face of the complaint.  Ball v. Famiglio, 726 F.3d 448, 459 n.16 (3d Cir. 2013).

It is abundantly clear that Reading considered Budhun to have a broken bone in her hand and nothing more.  The proposed amended complaint indicates that Alvarez knew that she had a broken finger.  App. 37.  Nowhere in the complaint does Budhun allege that Reading thought her injury was anything other than a broken fifth metacarpal.  This injury is objectively transitory and minor.  Budhun's proposed amended complaint concedes as much because it describes the loss of the use of her pinky finger as "temporary."  Id. She specifically alleges that her injury resulted in the "lost use of three fingers for approximately two months."  App. 40.  As it was evident from the face of her proposed amended complaint that Reading regarded her injury as one that is objectively transitory and minor, the District Court was well within its discretion to deny her motion for leave to amend as futile.

V.

For the foregoing reasons, we will vacate the judgment of the District Court as to Budhun's FMLA interference and FMLA retaliation claims.  We will affirm the District Court's order denying Budhun leave to amend her complaint to add an ADA claim.  We will remand the action for further proceedings consistent with this opinion.

---

[8] The appendix to the implementing regulations provides a good illustration of how this defense is intended to operate: "For example, an employer who terminates an employee whom it believes has bipolar disorder cannot take advantage of this exception by asserting that it believed the employee's impairment was transitory and minor, since bipolar disorder is not objectively transitory and minor."  29 C.F.R. § 1630, App.