**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————

No. 15-1952

—————————

HILLARY A. KACIAN,
                              Appellant

v.

POSTMASTER GENERAL OF THE UNITED STATES

—————————

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. 03-12-cv-00102)
District Judge: Honorable Kim R. Gibson

—————————

Argued: January 21, 2016

—————————————

Before: JORDAN, HARDIMAN, and GREENAWAY, JR., *Circuit Judges*

(Opinion Filed:  June 27, 2016)

Adam R. Gorzelsky, Esq. **[ARGUED]**
101 North Main Street
Suite 1-6
Greensburg, PA 15601
        *Attorney for Appellant*

Rebecca R. Haywood, Esq.
Laura Schleich Irwrin, Esq. **[ARGUED]**
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

Morgan Rehrig, Esq.
United States Postal Service
Room 6403
475 L'Enfant Plaza, S.W.
Washington, DC 20260
        *Attorneys for Appellee*

———————

OPINION[*]

———————

GREENAWAY, JR., *Circuit Judge*:

Appellant Hillary A. Kacian appeals the District Court's grant of summary judgment to the Postmaster General of the United States of America, her former employer, on her claim for retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Kacian alleges she was fired in retaliation for complaining to her supervisors about sexual harassment. We disagree with the District Court's conclusion that Kacian did not put forth sufficient evidence to demonstrate a causal connection between her protected activity and termination. Therefore, we will vacate the order of summary judgment and remand to the District Court.

## I. Background

Kacian began working for the Johnstown Post Office in March 2008 as a letter carrier. The sexual harassment she complains of began in 2010. In April of 2010, Kacian brought photographs from a vacation to work. Kacian claims that her supervisor, George LaRue, obtained the photographs and asked her if he could have a copy of a

2

photograph in which Kacian was wearing a bikini. She said no. LaRue asked Kacian for the photograph on a different occasion, and she again refused. Kacian claims that after these refusals, LaRue began assigning her more work than she could handle. She further claims that LaRue gave her inadequate direction in completing this work and refused to give her assistance when she requested it.

Around this time, in the summer of 2010, Kacian claims that LaRue also began making unwelcome comments to her about her physical appearance and private life, sometimes in the presence of other employees. On one occasion, in reference to a cold sore, LaRue told her "Oh, looks like you got something on your lip. You might want to get that checked out[,]" a comment that Kacian believed connoted herpes. J.A. vol. II at 49. On another occasion, Kacian was involved in a slip and fall accident, which caused her pain in her knees. In response to Kacian's injury, LaRue told her to "stay off [her] knees," which Kacian also believed connoted sexual activity. J.A. vol. II at 51. Kacian also claims that LaRue had a female supervisor tell her that her uniform shorts were too short, even though her shorts were regulation length. Finally, Kacian claims that in the spring of 2011, LaRue made disparaging comments to her about her weight, telling her at one point "you're getting a little hefty there. Maybe you should do something about it." J.A. vol. II at 55.

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

On July 14, 2011, Kacian complained to Union President Joseph Sarosi and supervisor Jeff Hauser about this harassment. Kacian claims that she told Hauser and Sarosi: "I'm tired of all this sexual harassment, given too much work that we can't do, being treated like dogs. . . . [T]he supervisors saying inappropriate things, the sexual harassment." J.A. vol. II at 66–68. In his deposition, Sarosi stated that Kacian complained about LaRue specifically; Kacian recalled that Sarosi told Hauser that they would be meeting with the Postmaster shortly thereafter to discuss her claims of sexual harassment. Hauser stated that he had no recollection of the conversation.

On July 19, 2011, LaRue and supervisor Cheryl Cernetich observed Kacian while she was on a delivery route. While driving, Kacian crossed an intersection with her vehicle door open. After this observation, LaRue held a pre-disciplinary interview with Kacian in which she admitted to driving across an intersection with her vehicle door open. Within hours, LaRue filed a disciplinary action against Kacian and recommended her termination to Postmaster Michael Olsavsky. Kacian's driving infraction was the sole basis of LaRue's recommendation. Kacian received notice of her termination on July 21, 2011.

As a transitional employee ("TE"), Kacian was not entitled to progressive discipline, or warnings, and could be fired for just cause. On the other hand, permanent employees, or "career employees," were entitled to progressive discipline before termination. Thus, because Kacian was ineligible for progressive discipline, she could be terminated based on the safety infraction alone.

4

However, according to Sarosi, "most times" when a safety infraction occurred, "[supervisors] just sweep it under the rug, and let it go." J.A. vol. II. at 163. Sarosi recalled incidents in which TEs and career employees were observed committing a variety of safety infractions and were not disciplined. These included TEs observed with the vehicle door open and not wearing a seatbelt, career employees observed driving with the vehicle door open and their feet hanging out of the door, and a TE that drove a vehicle into a cement wall. Further, Sarosi stated that during his time as Union President (a position he has held since 2009), only two TEs were terminated. The two TEs were Kacian and her boyfriend Randy Hamonko.

LaRue's deposition testimony echoed some of Sarosi's account. LaRue stated that during his time as a supervisor (a position he has held since 2007), he had only recommended the termination of three employees. One was Kacian in 2011. The other two were career employees—one was terminated for falsifying scans in January 2012, and the other was terminated when he "called off instead of coming to work [and] went to a football game" in December 2012. J.A. vol. II at 139. LaRue also stated that he had observed at least one other career employee driving with the vehicle door open against whom he did not take any formal disciplinary measures.

Kacian filed an Equal Employment Opportunity ("EEO") complaint on July 22, 2011, alleging sexual harassment. On August 24, 2011, Kacian and the Post Office entered into a settlement agreement. Under the agreement, Kacian agreed to withdraw her EEO complaint. In return, Postmaster Olsavsky was required to "talk with each

5

supervisor/employee he manages about how to appropriately interact with and talk to employees he/she supervises on the work floor." S.A. 138. Months after the agreement was formed, however, Kacian claimed that the Post Office breached the settlement agreement and appealed. On appeal, the Equal Employment Opportunity Commission found that the agreement was "void for lack of consideration," and issued Kacian a notice of her right to file a civil action.

Kacian filed suit asserting claims for retaliation, and upon the Post Office's motion, the District Court granted summary judgment. The District Court held that Kacian could not make a prima facie case of retaliation because she could not establish that LaRue knew about her sexual harassment complaint. It explained that "Kacian has cited no evidence, other than mere speculation based on [Sarosi's] testimony, that supports a finding that [LaRue] had knowledge of her harassment claim." J.A. vol. I at 19–20. The District Court also held that Kacian could not establish that her sexual harassment complaint was founded on an objectively reasonable belief of discrimination. The Court reasoned that the incidents complained of were not "so severe and pervasive as to alter the conditions of Kacian's employment." J.A. vol. I at 22.

## II. Standard of Review[1]

We exercise plenary review of the District Court's order for summary judgment. *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 251 (3d Cir. 2014). "In conducting

---

[1] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291.

6

our review, we view the record in the light most favorable to the party opposing the motion and draw all reasonable inferences in [her] favor." *Baldassare v. State of N.J.*, 250 F.3d 188, 192 n.1 (3d Cir. 2001). Further, in our review we do "not weigh the evidence, determine the credibility of witnesses, or substitute [our] version of the facts for the jury's version." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 190 (3d Cir. 1992), *cert. denied*, 507 U.S. 921 (1993).

### III. Analysis

In order to make a prima facie case of retaliation, the plaintiff must show: (1) that she engaged in a protected activity, which can include informal protests of discriminatory employment practices such as making complaints to management; (2) adverse action taken by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the protected activity and the adverse action. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

We conclude that Kacian's complaint was protected activity, because her belief that she was sexually harassed was objectively reasonable. In order to bring a retaliation claim, "the employee must have an objectively reasonable belief that the activity s/he opposes constitutes unlawful discrimination under Title VII." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir. 2008) (internal quotations omitted). Only if "no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination" is a complaint unprotected. *Id.* Importantly, "a victim of retaliation need not prove the merits of the underlying

7

discrimination complaint in order to seek redress." *Moore v. City of Phila.*, 461 F.3d

331, 344 (3d Cir. 2006) (internal quotations omitted).

Kacian's complaint meets this standard. The conduct Kacian complained of

involved supervisor LaRue asking her for a photograph of her in a bikini on more than

one occasion, making several unwelcome comments about her physical appearance and

private life, and refusing to give her assistance in completing unfamiliar tasks. The

incidents Kacian complains of were not as alleged isolated, nor was it ambiguous that she

was the intended target. Kacian reasonably, and in good faith, could have believed that

such harassment constituted unlawful discrimination, and a factfinder could conclude that

her complaint to Sarosi and Hauser was protected conduct under Title VII.

We also conclude that there is sufficient evidence to raise an inference of a causal

connection between Kacian's complaint and her termination.[2] Temporal proximity alone

can demonstrate a causal link when the adverse action and protected activity are very

close in time. *See Marra v. Phila. Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) ("In

certain narrow circumstances, an 'unusually suggestive' proximity in time between the

protected activity and the adverse action may be sufficient, on its own, to establish the

requisite causal connection." (internal citations omitted)). A time period of two days is

"unusually suggestive" of retaliatory motive, while a period of nineteen months is likely

---

[2] The Post Office does not dispute that, by terminating Kacian's employment, it took adverse action against her.

8

not. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)).

No more than five days after Kacian engaged in protected activity, LaRue recommended that she be fired. Two days later, she was terminated. The especially short time period we are presented with here reflects the "narrow circumstances" in which *Marra* applies. And even if we were not within those narrow circumstances, we conclude that the evidence "looked at as a whole" further raises an inference of a causal link. *Kachmar v. SunGard Data Sys. Inc.*, 109 F.3d 173, 177 (3d Cir. 1997); *see also Marra*, 497 F.3d at 302 ("[a] plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link" (quoting *Farrell*, 206 F.3d at 284)). Differential treatment of the plaintiff and similarly situated employees can support the inference. *See, e.g.*, *Marra*, 497 F.3d at 302; *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 754–55 (3d Cir. 1997). As can ongoing antagonism or retaliatory acts. *Farrell*, 206 F.3d at 280. Here, the totality of the evidence supports an inference of causation.

To start, Kacian presents evidence of differential treatment as the testimony of both LaRue and Sarosi suggests that Post Office employees were not typically terminated for safety infractions, and that supervisors enjoyed broad discretion in determining which infractions became actionable offenses. According to LaRue, before recommending Kacian's termination, he had not recommended the termination of any employee in his approximately six years as a supervisor. LaRue also stated that he had observed at least one employee committing the same or similar infraction and had taken no punitive

9

measures. Sarosi stated that "most times" supervisors "sweep [safety infractions] under the rug," and recalled specific instances in which employees, both TEs and career employees, were observed committing infractions comparable to Kacian's and were not disciplined.

Kacian also presents evidence of a pattern of antagonism following her complaint. Sarosi stated that Hamonko, who was known to be Kacian's boyfriend, was also terminated by the Post Office after Kacian's termination. Hamonko was reinstated after a successful grievance, but eventually quit because supervisors were "on him every day." The record further reflects that since 2009, Kacian and Hamonko were the only TEs terminated due to safety infractions. J.A. vol. II at 185. Viewed in the light most favorable to Kacian, this evidence can suggest retaliatory animus, and can thus raise an inference of a causal link.[3]

The Post Office argues that there can be no inference of a causal connection because LaRue and Olsavsky testified that they lacked knowledge of the complaint, and Kacian presents no direct evidence indicating otherwise. While we have refused to find

_____

[3] While this does not definitively prove that Hamonko's treatment was because of Kacian's interactions with the Post Office, the burden at this stage is not so high as to require plaintiffs to conclusively prove that any pattern of antagonism was because of their protected activity. *See Marra*, 497 F.3d at 302 (plaintiff could demonstrate ongoing antagonism in part because employer gave plaintiff a "look of disgust" when he learned about his protected activity). Further, the fact that Sarosi testified that it was Hauser, and not LaRue, who investigated Hamonko's infraction is not fatal to Kacian's position. This is both because Sarosi testified that the managers generally were "on [Hamonko] every day," which can also show ongoing antagonism from the supervisors as a group, and

an inference of a causal connection where the plaintiff relies only on her own uncorroborated beliefs to demonstrate knowledge, *see Daniels*, 776 F.3d at 196–97, or where there is no record evidence establishing knowledge, *see Moore*, 461 F.3d at 351, our case law allows a plaintiff to establish knowledge through circumstantial evidence. *See Azarro v. Cty. of Allegheny*, 110 F.3d 968, 973–74 (3d Cir. 1997) (en banc) (concluding that, even though there was "no evidence" that those who took adverse action had knowledge of plaintiff's complaint, summary judgment was inappropriate because there was circumstantial evidence raising an inference of knowledge). Olsavsky stated that his decision rested entirely on LaRue's recommendation. Thus, it is only necessary to determine whether LaRue had knowledge of Kacian's complaint. *See McKenna v. City of Phila.*, 649 F.3d 171, 176 (3d Cir. 2011).

Kacian proffers sufficient evidence to raise an inference that LaRue had knowledge of her complaint. Although temporal proximity alone cannot "establish that the adverse actor had knowledge of the protected conduct before acting," we have not held that temporal proximity is irrelevant to a finding of knowledge. *Daniels*, 776 F.3d at 197. Further, our precedents indicate that knowledge, like any other mental state, can be proven with circumstantial evidence. *Id.* at 197–98. That is, a rational juror could find the seven days between Kacian's complaint and termination, especially in the context of

_____

because our case law does not require a plaintiff to show that such antagonism came from the person who took the adverse action.

LaRue's history of lenience, a relevant factor—even if not a dispositive factor—in determining LaRue's knowledge.

Moreover, the record contains evidence that further raises an inference of knowledge above and beyond that which can be used to show causation. We begin by noting that the Johnstown Post Office does not have a large managerial staff. At the time of the events at issue, the Post Office employed only four supervisors. J.A. vol II at 109. In his deposition, Sarosi stated that he believed that LaRue, one of these four supervisors, learned about Kacian's complaint through Hauser. Thus, Kacian's assertion as to knowledge does not rely solely on her uncorroborated belief; rather, it is supported by an individual with unique access to the events at issue. Finally, a factfinder could reasonably infer that LaRue knew about the complaint as, according to Sarosi's testimony, it involved specific allegations against him. *See Daniels*, 776 F.3d at 197 (noting that "a factfinder potentially could infer" that defendants knew about plaintiff's protected activity because plaintiff's complaint "contained specific allegations against them"). This evidence, especially given the small size of Johnstown's managerial staff, could allow a juror to infer LaRue's knowledge.

## IV. Conclusion

For the foregoing reasons, we will vacate and remand the judgment of the District Court.

12